GERALD R. FALOONA and LYNDA FALOONA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Faloona v. Commissioner
Docket No. 8022-71.
United States Tax Court
T.C. Memo 1975-40; 1975 Tax Ct. Memo LEXIS 334; 34 T.C.M. (CCH) 265; T.C.M. (RIA) 750040; February 27, 1975, Filed Hugh O. Mussina, for the petitioners. Kemble White, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1968 and 1969 in the amounts of $722 and $519, respectively. The issue for decision is whether petitioners are entitled to exclude the amounts of $3,600 in 1968 and $1,800 in 1969 as a fellowship grant under the provisions of section 117, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in Dallas, Texas at the *335 time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1968 and 1969. Gerald R. Faloona, hereinafter referred to as petitioner, received a B.S. degree in chemistry and a Ph.D. in biochemistry from the University of Florida at Gainesville in June of 1962 and December of 1966, respectively. From January 1, 1967 until September 1, 1968, petitioner worked as a research associate at the University of Florida at Gainesville in lipoprotein systhesis, which was the area in which he had written his Ph.D. thesis. One of petitioner's professors at the University of Florida, Dr. Walter Dempsey, had become a researcher at the Veterans Administration Hospital at the suggestion of Dr. Paul Srere who, beginning in 1966 and continuing through the years here in issue, held a joint appointment as a professor at the University of Texas Southwestern Medical School and the biochemical laboratory of the Veterans Administration Hospital in Dallas, Texas. Shortly after Dr. Srere came to the Veterans Administration Laboratory, at his instigation the University of Texas applied to the Department of Health, Education and Welfare, Public Health *336 Service (PHS) for a research grant, the principal direction of the project to be by Dr. Srere as Chief of the Basic Biochemistry Unit of the Veterans Administration Hospital. The statement of the research objective was as follows: We will investigate the structures and the mechanisms of three different enzymes that catalyze similar lysse reactions of citrate. We will isolate for comparison one of these enzymes from many sources as well as isolating pairs of these enzymes from a single source. These comparative studies will aid both in the understanding of each mechanism, the evolution of a single enzyme and the evolution of an active site. Comparison of the different enzyme structures and their similar functions will aid in the general problem of structure-function relation of proteins. Later in the year 1966 the University of Texas Southwestern Medical School applied for a training grant for a program in Molecular Physiology of Metabolic Regulation. This program also was to be under the direction of Dr. Srere. In this application under the key professional personnel engaged in the training project, in addition to Dr. Srere who held a Ph.D. in Biochemistry, was listed the name *337 of Dr. Roger H. Unger who held an M.D. degree and was an Associate Professor of Internal Medicine at the University of Texas Southwestern Medical School and also worked with Dr. Srere in the Veterans Administration Hospital Laboratory. Under the summary of training proposal was stated: A training program in molecular physiology is proposed. Trainees will serve in two physically adjacent laboratories; one concerned with basic biochemical studies and one concerned with physiological and clinical studies. Emphasis will be placed upon the attempt to understand physiological events on the molecular level. Trainees will become familiar with the physical and chemical techniques available to biochemists in addition to learning the new techniques of physiology including radioimmunoassay of hormones. The approaches will be taught while studying regulation of carbohydrate metabolism from levels involving clinical observations to experiments involving the structure of enzymes. Dr. Unger's laboratory at the Veterans Administration Hospital was adjacent to the laboratory under the direction of Dr. Srere which was started in 1966. In applying for the research grant from PHS and the training *338 grant from PHS, it was Dr. Srere's intent to use the fund not only for equipment and supplies and technical assistance in the research project if needed, but also for postdoctoral fellows. The postdoctoral fellows were to select their own area of work, generally within the broad area of research covered by the grant. Therefore, Dr. Srere was interested in applications by individuals who had recently received Ph.D. degrees in either biochemistry or physiology who might be interested in work in the general area of the projects covered by the grant he had received. His purpose in obtaining postdoctoral fellows was to generally enhance the academic community since he hoped the further training in research in the laboratory combined with the general interest of the individual would be such that the individual would remain in academic medicine of some type. However, under the grant there was no requirement that the individual receiving the postdoctoral fellowship remain in such work or commit himself to any specific type of work. After the grant had been obtained by the University of Texas Southwestern Medical School for work in Dr. Srere's laboratory and Dr. Unger's laboratory at the *339 Veterans Administration hospital, Dr. Srere began looking for appropriate postdoctoral fellows. Dr. Dempsey suggested petitioner to Dr. Srere. He pointed out to Dr. Srere that petitioner's work had been somewhat different from the area covered by the PHS grant but that he was interested in biomedical research and was a hard-working researcher. Dr. Dempsey also talked to petitioner about the opportunities for work in the Veterans Administration Hospital Laboratory in Dallas, Texas. After Dr. Dempsey told petitioner about the opportunity for a postdoctoral fellowship at the University of Texas Southwestern Medical School and the Veterans Administration Hospital Laboratory, petitioner contacted Dr. Srere whom he had met before and asked to be considered for one of these fellowships. Petitioner visited Dr. Srere's laboratory and also the laboratory operated by Dr. Unger. He was interested in going to Dallas to take this fellowship because of being able to do work in both laboratories. He understood that after spending time in Dr. Srere's laboratory receiving basic biomedical training, he would be able to become involved in some projects that were being carried on in Dr. Unger's laboratory *340 of a physiological nature. On September 1, 1967, petitioner became a postdoctoral fellow at the University of Texas Southwestern Medical School and continued to be such a postdoctoral fellow through June 30, 1969. From January 1, 1968, to June 30, 1968, he received payments from the PHS research grant, and from June 30, 1968 to June 30, 1969, the payments he received were from the PHS training grant. From September 1, 1967 through February 29, 1968, he received payments at the rate of $680 per month. From March 1, 1968 through June 30, 1968, he received payments at the rate of $710 per month and from July 1, 1968 through June 30, 1969, he received payments at the rate of $721.66 per month. From January 1, 1968 to June 30, 1968, Federal income tax was withheld on all the payments made to petitioner, and from July 1, 1968 to June 30, 1969, Federal income tax was withheld from all of the payments made to petitioner except for the first $300 per month. Petitioner participated in group insurance programs provided by the University of Texas Southwestern Medical School, and sick and vacation leave was available to petitioner, but it did not accrue on a regular basis. The Veterans Administration *341 biochemical laboratory which is under the direction of Dr. Srere is primarily financed by the Veterans Administration. This laboratory is engaged strictly in research work. The result of the work done in the laboratory is from time to time published in various journals so that the information which has resulted from the research is made available to the interested public. There are no specific goals for the research though the broad area in which the research work is to be done is generally established by Dr. Srere; and if it is the subject of a PHS grant it is approved by PHS as well as by the University of Texas Southwestern Medical School in applying for the grant. Although the personnel budget is generally paid primarily by the Veterans Administration, much of the funds for basic research comes from grants such as the PHS grant. The research laboratories such as the one operated by Dr. Srere in the Veterans Administration Hospital at Dallas were established by the Veterans Administration as a method of attracting better physicians for care of their patients. Many good physicians were attracted into the Veterans Administration hospitals because of the existence of such research *342 laboratories in which they could spend a part of their time in research even though a major portion of their time was spent in patient care. When petitioner first came to the Veterans Administration Hospital Laboratory, Dr. Srere spent 2 to 3 months familiarizing him with the type of techniques used in that laboratory and then discussed with him the area in which he would prefer to do research. Petitioner, after talking with Dr. Srere and reviewing various projects that were available for research in the general concept of the grant under which he received his fellowship, chose a project designed to study the purification of the citrate enzyme from bacteria. This was a project which Dr. Srere had started with the help of a technician and when petitioner selected this project out of a number of possible projects under the PHS grant which paid his fellowship, Dr. Srere moved the technician to another problem, and he, himself, started working on another problem. Later, beginning in 1968, petitioner went into a project to study the physical behavior of a hormone, glucagon, in the laboratory operated by Dr. Unger. The research he did in connection with the physical behavior of enzymes *343 led into the work he did in Dr. Unger's laboratory. During the period July 1, 1968 until June 30, 1969, petitioner worked in both the basic biochemistry laboratory of Dr. Srere and the metabolism laboratory under Dr. Unger. After completing his postdoctoral fellowship at the Veterans Administration Hospital Laboratory in June 1969 petitioner became an Associate Professor in the Biochemistry Department of the University of Texas Southwestern Medical School and also a researcher in the Veterans Administration Hospital Laboratory. After completing his fellowship work, petitioner and Dr. Srere jointly published an article entitled, "E. Coli Citrate Synthase: Purification and the Effect of Potassium on some Properties." While petitioner was working with Dr. Srere and Dr. Unger, they would discuss with him the project on which he was working as well as articles with respect to research in various areas published by others. There was no close supervision by either Dr. Srere or Dr. Unger of petitioner's work, although from time to time they did attempt to give such suggestions and directions as they considered might be of some help to him. Petitioner, while a postdoctoral fellow, attended *344 numerous seminars on subjects in his area at the University of Texas Southwestern Medical School. He was in no way required or even expected to accept any form of employment with the University of Texas Southwestern Medical School, the Veterans Administration, or the PHS at the completion of his fellowship. In fact, it was unusual for a postdoctoral fellow at the University of Texas Southwestern Medical School to accept employment with the school at the conclusion of his fellowship. Although the National Institute of Health reserved patent and copyright privileges in respect to anything created under its grants, petitioner, when he accepted the grant, was unaware of this provision in the literature and would not have been interested since he did not expect to and did not do any research which resulted in patented items. Petitioners excluded from their taxable income for the calendar year 1968 the amount of $3,600 as nontaxable income from an educational fellowship, and in 1969 excluded $1,800 stating that the amount was received as "NIH Post-Doctoral Trainee doing full time research - $300.00 a Month" for the first 6 months. Respondent in his notice of deficiency increased petitioner's *345 income for the years 1968 and 1969 by the amounts of $3,600 and $1,800, respectively, stating that it was determined that the amounts received from the PHS research grant and the PHS training grant were considered additional income. ULTIMATE FINDING OF FACT Petitioner's work as a postdoctoral fellow at the University of Texas Southwestern Medical School in the years 1968 and 1969 was for the primary purpose of furthering his education and training and the amounts paid to him under the PHS research and training grants did not represent amounts paid as compensation for services primarily for the benefit of the grantor. OPINION Section 117(a)(1) provides that in the case of an individual, gross income does not include any amount received as a fellowship grant. Section 117(b)(2) provides that in the case of an individual who is not a candidate for a degree at an educational institution, subsection (a) shall apply only if the grantor of the fellowship or scholarship grant is one of the organizations listed therein and that the amount of the scholarship or fellowship grant excluded under section 117(a)(1) in any taxable year shall not exceed $300 times the number of months for which *346 the recipient received amounts under the scholarship or fellowship grant. Here, there is no contention between the parties with respect to both the University of Texas Southwestern Medical School and the PHS being organizations included under the provisions of section 117(b)(2) as proper grantors and there is no claim by petitioner that he is entitled to deduct more than $300 a month for each month he drew an amount under his grants. Furthermore, respondent does not contend that petitioner had received prior grants which would cause him to have exceeded the number of months under which he is entitled to deduct $300 of the grant under the provisions of section 117(b)(2). The only point of contention between the parties is whether the amounts paid to petitioner as a postdoctoral fellow during the years here in issue were received by him "as a fellowship grant" within the meaning of section 117(a)(1). It is respondent's position that the stipends received by petitioner do not meet the definition of a fellowship grant because of the provision of section 1.117-4(c), Income Tax Regs., [2] that amounts paid as compensation for services or primarily for the benefit of the grantor which *347 represent compensation for past, present, or future employment services or payment for services which are subject to the direction or supervision of the grantor or to permit the recipient to pursue studies or research primarily for the benefit of the grantor shall not be considered to be amounts received as a fellowship grant. Petitioner takes direct issue with respondent's contention on the basis of the facts in this case. Petitioner states that the record here shows that the *348 amounts of stipend paid to him during all of the times here in issue were paid to him to enable him to pursue studies or research for the primary purpose of furthering his education and training as an individual and therefore under the clear language of section 1.117-4(c), Income Tax Regs., do not constitute compensation for past, present, or future employment services or an amount paid to enable him to do research primarily for the benefit of the grantor. Petitioner in this case makes no contention that section 1.117-4(c), Income Tax Regs., is invalid. This regulation was held to be a valid regulation in Bingler v. Johnson,394 U.S. 741 (1969). In upholding the validity of the regulation the Supreme Court pointed out that where the amount paid to an individual required a quidproquo in services, it was not a scholarship or fellowship within the ordinary understanding of those terms. As we pointed out in the recent case of Sheldon A. E. Rosenthal, 63 T.C. (Jan. 13, 1975), the primary purpose standard as set forth in section 1.117-4(c), Income Tax Regs., relates to the purpose for which the payments are made. This purpose must be determined *349 from all the surrounding facts in each particular case. From the facts in this record we conclude that the primary purpose of the payments made to petitioner was to enable him to further his own individual education and training and were not either compensation for past, present, or future services or for research primarily for the benefit of the grantor and were not for services subject to the direction or supervision of the grantor. This record clearly shows that petitioner performed no services of any type for the University of Texas Southwestern Medical School. It further shows that petitioner rendered no services for PHS other than as his work might be for the general or common benefit of mankind, an incidental type of benefits which we do not consider to be of a nature to change the essential character of the grants. Louis C. Vaccaro,58 T.C. 721, 729 (1972). The facts also show that any benefits derived by the Veterans Administration from petitioner's work were incidental. The maintaining of the research laboratory at the Veterans Administration Hospital to do academic and theoretical research was for the benefit of the hospital and the Veterans Administration *350 in attracting doctors to render patients' care. The record indicates that this function was not dependent on postdoctoral fellows working in the laboratory although the researchers in the laboratory might have broadened their scope of interests in their work in connection with the training of postdoctoral researchers. In our view this record clearly shows that the postdoctoral fellowship grants were for the purpose of further research training of persons with Ph.D. degrees in certain areas with the hope that they would remain interested and stay in the field of academic medicine after their training although there was no requirement that they do so. The record shows that the postdoctoral fellows did not in fact replace persons who otherwise would have been employed by either the University of Texas Southwestern Medical School or the Veterans Administration. Although the postdoctoral fellows were expected in a general way to work within the range of the research project for which the PHS grant was received, they chose their own project according to their interests and their consideration of their needs for further training and not because of areas of research which either the medical *351 school or the Veterans Administration considered to be beneficial to the school or the Veterans Administration. Before a postdoctoral fellow was selected, he would have evidenced an interest in further training in the general area of research covered by the grant. While Dr. Srere and Dr. Unger worked with the fellow in a general way, the nature of their work was to assist with the training of the fellow and not for the purpose of directing or supervising his work for the grantor. In Frederick A. Bieberdorf,60 T.C. 114, 119 (1973), we pointed out that underlying the provisions of section 1.117-4(c), Income Tax Regs., which require inclusion of stipends in gross income where the amounts paid for compensation for services are primarily for the benefit of the grantor is the premise that where such amounts are a quidpro quo for services performed or to be performed for the grantor, they should not be excluded from the income of the recipient. The evidence here, as did the evidence in the Bieberdorf case, shows that there were "no strings tied to the payment" which petitioner received. The program was established and operated to provide for further training *352 of individuals who had already received a Ph.D. degree, that training to be in an area which would further the trainee's interest in the field of academic medicine. In our view these payments were a fellowship grant within the meaning of the regulations. We therefore hold that petitioner is entitled to an exclusion of a fellowship grant of $3,600 in 1968 and $1,800 in 1969. Decision will be entered for petitioner.
Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. Sec. 1.117-4Items not considered as scholarships or fellowship grants.
The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117: * * * * * (c) Amounts paid as compensation for services or primarily for the benefit of the grantor.↩ (1) Except as provided in paragraph (a) of section 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.